**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> vs. <br><br> BENJAMIN TAYLOR, <br><br> Defendant. | 18 Cr. 184 (DLC) |

## SENTENCING MEMORANDUM ON BEHALF OF
## BENJAMIN TAYLOR

Celeste L.M. Koeleveld
Daniel S. Silver
Argjenta Kaba
CLIFFORD CHANCE US LLP
Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone: (212) 878-8000
celeste.koeleveld@cliffordchance.com
daniel.silver@cliffordchance.com
argjenta.kaba@cliffordchance.com

*Attorneys for Defendant*
*Benjamin Taylor*

1

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT...................................................................1

II.   BENJAMIN'S PERSONAL HISTORY AND CHARACTERISTICS..................................2

      A.    Benjamin's Upbringing and Education...................................................3

      B.    Benjamin's Professional Career ..........................................................5

      C.    Benjamin's Current Circumstances and Dedication to His Family and
            Friends.......................................................................................10

      D.    Benjamin's Character and Values.......................................................13

      E.    Benjamin's Financial Circumstances..................................................14

III.  NATURE AND CIRCUMSTANCES OF THE OFFENSE.................................15

IV.   PROCEDURAL HISTORY ................................................................17

      A.    The Indictment ..........................................................................17

      B.    Arrest in Monaco and Time in Custody ...........................................17

      C.    Benjamin's Efforts to Cooperate....................................................18

      D.    The Plea Agreement ...................................................................20

      E.    The SEC Settlement Agreement.....................................................22

V.    CONSIDERATION OF THE RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a)
      DEMONSTRATES THAT A SENTENCE OF TIME SERVED IS SUFFICIENT, BUT NOT
      GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING .........23

      A.    A Sentence of Time Served Would Adequately Reflect the Out-of-
            Character Nature of the Offense in Light of Benjamin's History and
            Characteristics............................................................................25

      B.    Benjamin Has Accepted Responsibility and Is Deeply Remorseful..................28

      C.    A Sentence of Time Served Is Consistent with Sentences Imposed on
            Defendants Convicted of Similar Conduct............................................30

      D.    The Danger of Sentencing Disparity Is Greatly Enhanced by Virtue of
            Benjamin's Non-Citizen Status .......................................................37

      E.    A Sentence of Time Served Will Achieve the Goals of Specific and General
            Deterrence.................................................................................38

F.    A Period of Incarceration Will Upend the Progress Toward Rehabilitation that Benjamin Has Already Made and Impose Substantial Burdens on Benjamin's Parents and Sister ................................................................................ 41

**VI. CONCLUSION** ................................................................................................**43**

**TABLE OF AUTHORITIES**

CASES

*Rita v. United States*, 551 U.S. 338 (2007) ........................................................................24

*United States v. Chow*, 17 Cr. 667 (S.D.N.Y. Jan. 17, 2019)......................................32, 33

*United States v. Cohen*, 19 Cr. 714, ECF No. 48 (S.D.N.Y. June 9, 2020) ..................31

*United States v. Collins*, 18 Cr. 567 (Jan. 23, 2020) ........................................................34

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005)......................................................24

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) .....................................................24

*United States v. Feldman*, 23 Cr. 320 (S.D.N.Y. May 15, 2024).............................35, 36

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012)........................................38

*United States v. Lavidas*, 19 Cr. 714, ECF No. 127 (S.D.N.Y. July 2, 2020). ..............32

*United States v. Jung*, 18 Cr. 518 (S.D.N.Y. June 3, 2019)...........................................35

*United States v. Nguyen*, 12 Cr. 495 (Mar. 14, 2013)...............................................33, 34

*United States v. Tsai*, 19 Cr. 675 (S.D.N.Y. Jan. 10, 2020) ...........................................35

*United States v. Velazquez*, 16 Cr. 233, 2017 WL 2782037 (S.D.N.Y. May 26, 2017)............40


Statutes
18 U.S.C. § 3553(a) ...............................................................................................passim


OTHER AUTHORITIES

Richard A. Frase, *A More Perfect System: Twenty-Five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (2005)...............................................41

United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf ................................................................39

United States Sentencing Commission, *Recidivism and the "First Offender"* (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf .........39

## I.    PRELIMINARY STATEMENT

Benjamin Taylor comes before the Court for sentencing a far different person from the young investment banker who ill-advisedly fell prey to a world of easy money and perceived status in 2012.  He has spent the last eight years since his arrest in Monaco in 2018 trying to make amends for his misdeeds, by accepting responsibility and attempting to cooperate with authorities in the United States and France, and by rebuilding his professional career and personal reputation.  While cooperation did not bear fruit as he had hoped, he is determined to set things right and move forward with his life by appearing voluntarily in the United States to plead guilty, despite the fact that he is a French citizen residing in France where he is beyond the reach of extradition to the U.S.  He also recently resolved the parallel SEC proceeding, agreeing to disgorgement of $500,000 in ill-gotten gains.

Given Benjamin's current circumstances, we respectfully request a sentence of time served—the two months Benjamin spent in prison in Monaco in 2018—so that he can continue on his current path of personal and professional rehabilitation.  Personally, a sentence of time served would allow Benjamin to continue to devote himself to the care of his family.  Benjamin resides in France with his aging parents and his father is suffering from ▮▮▮▮▮▮▮▮.  In addition, Benjamin's sister needs ▮▮▮▮▮▮ ▮▮▮ in the coming months, making her unable to care for her infant daughter while she recovers.  Professionally, a sentence of time served would allow Benjamin to

continue to devote effort to the business he is building, which is finally gaining traction after years of hard work.

As set forth more fully below, we respectfully submit that consideration of the sentencing factors under 18 U.S.C. § 3553(a) confirms that a sentence of time served is the just result for Benjamin Taylor.  While the offense conduct, which Benjamin profoundly regrets, was undeniably serious, it remains an aberration in an otherwise hard-working and law-abiding life.  Benjamin's sincere, substantial and successful efforts at rehabilitation since his arrest in Monaco demonstrate that he is fundamentally a kind, decent and honorable person who is deserving of a second chance.  A sentence of time served would also be consistent with sentences imposed on other offenders under analogous circumstances (notwithstanding Benjamin's highly unusual decision to voluntarily travel to the United States to accept responsibility), and it would fully achieve the goals of specific and general deterrence.  Finally, a sentence of time served would allow Benjamin to continue his rehabilitation while also continuing to care for his family.  A sentence of time served is therefore "sufficient, but not greater than necessary," to achieve the goals of punishment.  *See* 18 U.S.C. § 3553(a).

## II.     BENJAMIN'S PERSONAL HISTORY AND CHARACTERISTICS

Beginning fourteen years ago, when he was in his late twenties, Benjamin Taylor made a serious mistake:  he and his then-girlfriend, Darina Windsor, accessed confidential deal information from their investment bank employers and passed that

information to intermediaries who in turn passed it to various traders.  Now 42 and anxious to put this life-altering misdeed behind him, Benjamin—who as a French national residing in France is beyond the extradition power of the United States—has come to New York voluntarily to face the consequences of his actions.  Benjamin deeply regrets his past indiscretions and asks for the Court's mercy in imposing a non-incarceratory sentence that will permit him to resume his law-abiding life in France.  Indeed, with the criminal charges and SEC proceedings finally behind him, Benjamin hopes to continue a productive and honest life and contribute to society.  Benjamin intends to make amends for the crimes he committed long ago.

### A.  Benjamin's Upbringing and Education

A dual citizen of France and England, Benjamin was born on November 15, 1983, in Strasbourg, France, to Christopher and Françoise Taylor.  His father, a British citizen born in July 1949 and now retired, worked as an international director of a healthcare company in France.  His mother, a French citizen born in April 1953, is a painter and a homemaker.  Benjamin has one younger sister, Olivia, who was born in October 1985.

When Benjamin was two years old, the family moved to Vence, a town in southern France near Nice, because of his father's work.  From the example provided by his maternal grandfather, a professional soccer player in France, Benjamin learned that one must "earn[] everything through relentless effort" and "never ask[] for what [you

have] not worked for."  Letter of Benjamin Taylor (B. Taylor Letter), Exhibits at 3.[1]

Following that example, Benjamin thoroughly devoted himself to his schoolwork.  With

what Benjamin's father describes as "extraordinary hard work" and "relentless

dedication," Letter of Christopher Taylor (C. Taylor Letter), Exhibits at 7, Benjamin—a

gifted student who excelled in math and science—eventually attained graduate degrees

in both engineering and finance.

Benjamin completed his primary and secondary education at public school in

Vence and Cagnes *sur mer*, completing what are known as "A-levels" and achieving a

Scientific Baccalauréat degree with honors.  Benjamin then attended an international

preparatory school in Valbonne and Paris, *Classe préparatoire aux Grandes Écoles* (CPGE),

where he excelled in math and science and prepared to take "*Grand École*" exams which

are required for admission to France's top universities.

Benjamin next attended *École Spéciale des Travaux Publics* (ESTP), a prestigious

French engineering school and *grand école*, in Paris.  He graduated in 2007, with honors,

with the equivalent of a master's in civil engineering.  Given his additional interest in

business and finance, Benjamin next attended *École Supérieure de Commerce de Paris*

(ESCP), considered the world's oldest business school and also a *grand école*, in Paris,

graduating in 2009, again with honors, with the equivalent of a master's in business

---

[1] Benjamin's letter to Your Honor is included with the Sentencing Memorandum Exhibits
being filed with this Sentencing Memorandum.  References to these exhibits are
indicated as "Exhibits at ___," providing the page number of the PDF document.

administration and finance.  While at ESCP, Benjamin interned from April to October 2008 at Deutsche Bank in Paris, focusing on investment banking and witnessing the financial crisis unfold firsthand.

As he embarked on his career, Benjamin saw himself as "someone who found meaning in hard work, who delivered results without shortcuts, and who understood that quality and integrity were not separate things."  B. Taylor Letter, Exhibits at 3.

### B.  Benjamin's Professional Career

Consistent with his upbringing and education, Benjamin continued, at first, to derive satisfaction "not from status but from the quality of the work itself."  B. Taylor Letter, Exhibits at 4.  Following graduation from ESCP, Benjamin interned from March to August 2009 with the head of strategy and corporate planning at *Compagnie de Saint-Gobain S.A.* (Saint-Gobain), one of France's leading industrial conglomerates.  Working closely with the company's industrial and regional directors, Benjamin assisted Saint-Gobain's Chief Financial Officer with financial modeling to develop the company's five-year strategic plan.  Because of his work ethic, Benjamin's supervisor nicknamed  him the "Benedictine monk." *Id*.

From early 2010 until April 2014, Benjamin worked as an analyst in the investment banking team at Moelis & Company, focusing on mergers and acquisitions. In April 2014, Benjamin moved to Credit Suisse, where he worked as an associate in the

energy team originating and executing mergers and acquisitions and other strategic advisory assignments for major international corporations.

Benjamin left Credit Suisse in February 2015 to develop his entrepreneurial interests in resource management and trading.  To that end, he founded his own company, International Resources Management, in May 2015 in London.  From its founding until approximately May 2017, the company traded in used construction equipment around the world, including in Africa.  Additionally, from July 2016 until his arrest in September 2018, Benjamin worked as a consultant for Samimex, a company involved in trading agricultural products—especially vanilla—from Madagascar to the EU market.

As described more fully below (*see* Nature and Circumstances of the Offense), it was while employed at Moelis & Company that Benjamin made a grave mistake and became involved in insider trading.  That eventually led to Benjamin's arrest in Monaco in September 2018—what Benjamin describes as "the lowest point of my life—not because of the conditions, but because of the distance between the person I was raised to be and the person I had become."  B. Taylor Letter, Exhibits at 4.  Following his release from jail, Benjamin determined to rebuild his life and his career:  "I started from zero.  I learned commodity trading from the ground up, transaction by transaction, with nothing but the same work ethic my grandfather modelled and the monks [his teachers in preparatory school] reinforced." *Id*.

Thus, in February 2019, building on a connection he had developed with the Dangote Group, a Nigerian conglomerate headquartered in Lagos, Benjamin founded the Ker Group Ltd., a company specializing in commodities consulting with a primary focus on liquefied natural gas (LNG), one of Dangote's new ventures.  Initially, Benjamin worked as a broker, advising on oil and gas transactions.  Eventually,  Benjamin also began acting as a principal, buying and selling for his own company.

To that end, Benjamin founded an affiliated company, Ker S.A.M., in February 2022.  Ker S.A.M. exports and trades LNG and other raw materials from across Africa, "improving food security and generating domestic wealth," according to its website, www.thekergroup.com.  The company, which is headquartered in Monaco, has two main business lines:  LNG and urea (fertilizer).  Benjamin is currently the managing partner of the company, which also has several people working as independent contractors to help with day-to-day operations.  Benjamin's father serves as chairman of the company, and his father and two others (the nephew of the head of Dangote Group and a friend of Benjamin's) are its shareholders.  Benjamin's father also helped with the initial capital needed to start the company, but the company is now generating its own cash flow from LNG and fertilizer trading to cover expenses.

Benjamin's professional efforts since 2018 have earned him recognition and respect from those around him.  Guillaume Cyprien, a business owner in Saint Paul de Vence who has provided professional and administrative support to Benjamin, including

7

office space and access to his professional network, has witnessed firsthand how Benjamin rebuilt his career, "focus[ing] on rebuilding his professional life with structure and dignity."  Letter of Guillaume Cyprien (Cyprien Letter), Exhibits at 19.  Cyprien has seen Benjamin "work[] with extraordinary dedication—long hours, very few days off, and a [high] level of focus and discipline."  In the process, Benjamin "buil[t] something real from the ground up, with no shortcuts and no excuses."  *Id*.

Anne Marie Panunzi, who served as Chief of Staff to a department of the French Republic, has been similarly impressed by Benjamin's "analytical skills, precision, and refusal to take intellectual shortcuts," which "earned him the unanimous respect of [her] colleagues."  Letter of Anne Marie Panunzi (Panunzi Letter), Exhibits at 21.  Panunzi made these observations when the Chief of Staff to the President of the French Republic sought Benjamin's expert advice about the 2022 energy crisis and the role of Nigeria. The report Benjamin prepared had "exceptional depth and clarity, offering a level of detail and strategic vision that far exceeded what is typically submitted."  *Id*.  Indeed, the report so impressed the presidential advisors that they requested bound copies of the report.  At the same time, Benjamin displayed "diligence, humility, and integrity" in his work:  "he always acknowledged the limitations and uncertainties of his models—a sign," in Panunzi's view, "of profound intellectual honesty and a total lack of intent to deceive."  *Id*.

Pierre Regent, a former diplomatic adviser to the President of the French Republic, reached the same conclusions from his interactions with Benjamin.  Regent first met Benjamin approximately two years ago in the context of a meeting with the President of the French Republic.  He has since stayed in contact with Benjamin, collaborated with Benjamin on several projects, and gotten to know him personally.  In Regent's view, Benjamin's "work ethic is among the most impressive I have encountered," including among "heads of state and government and senior executives across multiple continents."  Letter of Pierre Regent (Regent Letter), Exhibits at 23. Benjamin "approaches every task with rigour, diligence, and seriousness of purpose that is genuinely rare.  The quality of his work consistently reflects someone who holds himself to a high standard, not because he is asked to, but because that is who he is." *Id*.  On a personal level, Regent has found Benjamin to be "respectful, measured, and fundamentally decent."  *Id*.  As a result, Benjamin is someone Regent "recommend[s] without reservation to [his] network" because "[he] believe[s] in [Benjamin's] integrity and in the honest path he has chosen."  *Id*.

As a result of their experiences with Benjamin, Cyprien, Panunzi and Regent see Benjamin as someone deserving of a second chance.  Panunzi highlights Benjamin's "capacity for rehabilitation," Panunzi Letter, Exhibits at 21, and to Regent, Benjamin's rehabilitation "is not an aspiration; it is already well advanced and producing tangible results," Regent Letter, Exhibits at 23.  Cyprien sees Benjamin's efforts to rebuild his life

9

and career as "a source of genuine pride, not only for [Benjamin], but for those of us who have watched him do it."  Cyprien Letter, Exhibits at 19.

Jeremy Urano, Benjamin's engineering school classmate and friend of 20 years, echoes these sentiments.  While acknowledging that "Benjamin made serious mistakes," Urano believes Benjamin to be "a man of genuine substance, with the relationship[s], the discipline, and the self-awareness to make something meaningful of a second chance." Letter of Jeremy Urano (Urano Letter), Exhibits at 17.

### C. Benjamin's Current Circumstances and Dedication to His Family and Friends

Benjamin's efforts to rebuild his life and career since 2018 "have been a long, difficult battle for him, both personally and professionally," but Benjamin today "is working tirelessly to build his own business and provide for his family."  C. Taylor Letter, Exhibits at 7.

In addition to the dedication to hard work described above, Benjamin is also devoted to his family.  According to Benjamin's sister Olivia, Benjamin is "the cornerstone" of the family, someone who has always been her "mentor and protector," "guid[ing] her education, spend[ing] hours practicing interviews with [her], and help[ing] shape [her] career."  Letter of Olivia Taylor (O. Taylor Letter), Exhibits at 12.  To Olivia, Benjamin's "true character" is "a man of immense heart, tireless work ethic, and professional devotion to his family."  *Id.*  Consistent with that reputation, Benjamin supported Olivia's fiancé, Brendan Cody-Kenny, in establishing Brendan's start-up

10

business venture, Xiliary Systems.  Without being asked, Benjamin "took a real interest, reviewed the new project, joined calls, challenged the go-to-market strategy; and made introductions to his network." Letter of Brendan Cody-Kenny (Cody-Kenny Letter), Exhibits at 15.

Benjamin has shown similar devotion to his friends, sometimes in the most dire of circumstances.  Benjamin's friend Jeremy Urano describes a harrowing experience when a team of climbers including Benjamin and Jeremy were unexpectedly caught in severe weather as they were descending Mont Blanc.  Urano Letter, Exhibits at 17.  "In these conditions—physical exhaustion, genuine danger, no margin for error—Benjamin was calm, methodical, and focused on the safety of the team above his own discomfort."  *Id*. To Urano, Benjamin's actions revealed his true character; he has "never known [Benjamin] to act from malice, selfishness, or disregard for others."  *Id*.  It is not surprising, then, that Benjamin was best man at Urano's wedding and is godfather to Urano's daughter.  *Id*.

In recent years, especially as first his grandparents and now his parents have aged, Benjamin has, in his sister Olivia's words, become "the backbone of our family's caregiving efforts."  O. Taylor Letter, Exhibits at 12.  As noted earlier, Benjamin currently lives with his parents in Vence.  Benjamin's father Christopher, who is 77 years old and retired, is ███████████████████████.  Because of ██████████████, Christopher

██████████████████████████████████████████████████████

██████████████████████. Therefore, "Benjamin's presence and help have become a necessity for" his mother, Françoise, who emphasizes how Benjamin "consistently puts everyone else's needs before his own."  Letter of Françoise Taylor (F. Taylor Letter), Exhibits at 10.  ████████████████, Benjamin's help is not only a "practical[]" necessity for his mother, ██████████████████████████, but also a necessity "from a psychological and emotional point of view."  *Id*.

And now Olivia and her family are also in need of Benjamin's assistance.  Olivia is 40 years old and lives in Dublin, where she works at Google in digital marketing.  She and her fiancé, Brendan Cody-Kenny, have an infant daughter who was born in April 2025.  Olivia has a ██████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████.  O. Taylor Letter, Exhibits at 13; Letter of Carla Canniffe, Exhibits at 27.  ████████████, Olivia and Brendan will need help caring for their young daughter while Olivia recovers; Benjamin has offered to help provide that care so that Brendan can continue working at Xiliary Systems, the company that he founded last year and that requires his near-complete attention.  O. Taylor Letter, Exhibits at 13.

Fortunately, Benjamin himself has no medical or health issues.  He maintains a healthy lifestyle, with a healthy diet and consistent exercise regimen.   Indeed, showing what his trainer terms "exceptional[] dedicat[ion] and discipline[]," Benjamin exercises six

days per week, with a "steadfast commitment to doing things the right way," Letter of

Yannis Odru, Exhibits at 25, that mirrors his professional work ethic.  Benjamin drinks

alcohol only in moderation and avoids drugs and cigarettes.

### D.  Benjamin's Character and Values

The consistent theme running through the submissions from Benjamin's family,

friends and colleagues is that Benjamin is at his core a man of integrity who works

extremely hard and devotes himself to his family and friends.  That man of integrity lost

his way for a period of time when he was young—"betray[ing] everything [he] had

built"—but he has now found his way back.  Having "lost sight" of "the values [his]

grandfather taught [him]," he has spent the last eight years returning to them.  B. Taylor

Letter, Exhibits at 5.  Importantly, Benjamin blames no one but himself for his crime.  He

"understand[s] the gravity of what [he] did" and "deserved" the "severe" consequences

of his actions.  *Id*. at 4.

But as the submissions also demonstrate, Benjamin has incredible heart and

resilience:  he is determined to regain his professional and personal reputation, and is

committed to doing so the right way, through hard work and grit, taking nothing for

granted.  In the process, he has earned the respect of his family, friends and colleagues.

In short, as his father submits, Benjamin is "a man who has learned from his errors and

who is dedicated to getting his life back on track through honest, hard work."  C. Taylor

Letter, Exhibits at 7.  Benjamin's friend Jeremy Urano has similarly seen Benjamin

respond with "honesty and resolve", without "deflect[ing] responsibility," to "rebuild his life professionally."  Urano Letter, Exhibits at 17.

It is thus Benjamin's hope that, as urged by Saint Paul de Vence business associate Guillaume Cyprien, the Court will define him not "by the mistake that brought him here" but "by what he has done since—and what he has done since is a source of genuine pride, not only for himself, but for those of us who have watched it."  Cyprien Letter, Exhibits at 19.  Another business associate, Pierre Regent, echoes that hope:  to him, Benjamin "deserves a second chance.  Not as an act of clemency toward someone who has failed to learn, but as a recognition of someone who has already demonstrated, through years of hard work and honest conduct, that he has [learned]."  Regent Letter, Exhibits at 23.

### E.  Benjamin's Financial Circumstances

Having primarily used the modest profits from his oil and gas trading business to further develop that business, Benjamin has limited financial resources.  From 2019 through 2023, the business generated between $100,000 and $200,000 per year in consulting fees on LNG and urea cargoes.  However, Benjamin used the majority of those fees as a source of capital to start Ker S.A.M. in 2022.  While the business began to earn more significant revenue in 2024, only $25,000 was distributed from the company that year as the remainder of the revenue was used to pay for trade finance facilities and other structural costs.  For the same reason, no profits were distributed from the

14

company in 2025 or 2026.  Benjamin does not own any real property (as noted above he resides with his parents), nor does he have any significant savings or other assets.  As a result, Benjamin has had to rely on his family for financial support, including to pay the first $250,000 installment of his $500,000 SEC settlement.  With the second and final installment due in December 2026 (plus an additional $10,000 to satisfy the forfeiture judgment in this case), Benjamin's finances are highly strained.

### III.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

To Benjamin, his involvement in the instant offense is a "betrayal of everything [he] had built" in his life—his education, his career, and who he was raised to be and remains at his core.  Before the offense conduct, he saw himself as "someone who found meaning in hard work, [and] who delivered results without shortcuts."  B. Taylor Letter, Exhibits at 3.  But Benjamin lost his way while working in London fourteen years ago: enamored of life in the fast lane—a world of wealth, luxury goods, lavish parties and expensive trips—Benjamin succumbed to social pressures in a way that he knew was wrong but that, in his youth and insecurity, he could not find the strength to resist.  *Id*. He profoundly regrets his actions.

Benjamin's involvement began in 2012 when John Dodelande, whom Benjamin had met when he was living in Paris in or about 2007, came to London and introduced Benjamin—then a junior analyst at Moelis—to his network.  Dodelande, who claimed access to substantial resources, suggested that Benjamin use his access to inside

15

information to provide tips to Dodelande's connections.[2]  To his great regret, Benjamin

did as suggested and provided John Dodelande and later his brother, Kevin Dodelande,

with inside information that he obtained from his own work at Moelis; from his

girlfriend, Darina Windsor, who also worked at Moelis and then at Centerview Partners;

and from another Moelis colleague.  Over time, Benjamin provided information to the

Dodelandes relating to approximately fifteen transactions involving listed securities,

most of which was sourced by Darina.  Benjamin understood that the Dodelandes then

passed that information on to traders who used the information to trade ahead of

merger announcements and other non-public events.

The Dodelandes identified and interacted with the traders; Benjamin did not

provide information to the traders directly and he did not know the specifics of their

trading activity or how much they profited from those trades, although he understood

from the Dodelandes that the trades were lucrative.  In return for the information, the

Dodelandes periodically gave Benjamin cash (typically in increments of approximately

$5,000 or $10,000) and gifts such as luxury watches and clothes; they also paid for

expensive trips for him and Darina.  While Benjamin did not keep records of the value of

---

[2] According to the Indictment, it was Benjamin who recruited the Dodelandes into the insider trading scheme.  Superseding Indictment (ECF No. 19) ¶ 13.  While that is not consistent with Benjamin's recollection, his disagreement with this allegation is not meant to detract in any way from his determination to take full responsibility for his actions.  Regardless of whose idea the scheme was, Benjamin recognizes that it was wrong and sincerely regrets his involvement.

the cash payments and gifts he received from the Dodelandes, he understands that the Government maintains (based on information provided by the Dodelandes) that the total value of the items provided to him and Darina was just over $1 million.

In early 2016, based on an investigation conducted by the Serious Fraud Office ("SFO"), authorities in London raided Benjamin and Darina's apartment (Benjamin was away at that time), seizing computers, phones and records.  Following the raid, Darina was terminated from Centerview Partners.  While Benjamin offered (through counsel) to meet with the British authorities, he was never interviewed.

## IV.    PROCEDURAL HISTORY

### A. The Indictment

Benjamin was indicted on March 6, 2018.  The indictment was filed under seal, and a warrant was issued for Benjamin's arrest.  At the time, Benjamin was living in Monaco.

### B. Arrest in Monaco and Time in Custody

On September 2, 2018, Benjamin was arrested in Monaco on a provisional arrest warrant and detained pending an extradition request from the United States.  Following his arrest, through counsel, Benjamin tried to cooperate with the United States Attorney's Office (USAO).  After debriefing Benjamin in Monaco, counsel provided the USAO with an attorney proffer of information that could be used in the investigation

and prosecution of other persons.  However, the prosecutors did not express interest in cooperation at that time and the extradition proceedings continued.

Benjamin's incarceration in Monaco was extremely difficult for him and his family. Benjamin quickly came to understand the harsh reality of his circumstances when he was suddenly detained along with narcotics dealers and violent offenders.  On October 30, 2018, after 57 days in custody, Benjamin was released when the United States's extradition request was rejected because it failed to comply with the terms of the extradition treaty between the United States and Monaco.  He returned to France where he has resided with his parents ever since.  Since France does not extradite its nationals, Benjamin was not, and could not be, subject to any extradition proceedings while in France.

### C.  Benjamin's Efforts to Cooperate

Since his arrest in Monaco, Benjamin has consistently expressed his willingness to cooperate with authorities in both the United States and France.  In furtherance of that goal, he has provided detailed information to the authorities in both the United States and France about potential targets of investigation.  As noted earlier, at the time of his arrest in Monaco, Benjamin—through counsel—identified not only potential targets of investigation related to the insider trading scheme in which Benjamin had participated, but also potential targets whom Benjamin believed were involved in other fraudulent schemes and money laundering.  In addition, entirely on his own initiative, Benjamin

18

provided extensive information to the *Parquet National Financier* (PNF), the agency in France that is responsible for investigating serious economic and financial crimes, about the insider trading scheme and about other potential targets of investigation into fraud and money laundering in France. While the PNF expressed interest in the information Benjamin provided, which was highly detailed and well-corroborated with travel documents, telephone records, and other materials, it ultimately decided against pursuing its own investigation.

Most recently, Benjamin provided information to the USAO relating to the prosecution of Joseph El-Khouri, one of the traders who used inside information provided by the Dodelandes to conduct trades in England and elsewhere. Through counsel, beginning in 2022 Benjamin provided details about social contacts he had with El-Khouri; Benjamin also offered photographs and documents that corroborated his account. While the USAO expressed interested in that information and indicated it was potentially useful, the United States's effort to extradite El-Khouri from England was ultimately unsuccessful and El-Khouri thus remains in England, beyond the reach of U.S. authorities. As a result, Benjamin's effort to cooperate against El-Khouri did not lead to a cooperation agreement.

Benjamin remains willing to cooperate with the authorities, should his assistance be required.

### D. The Plea Agreement

Since 2018, Benjamin has been "under the weight of this case and its recurring shadow, every single day."  B. Taylor Letter, Exhibits at 4.  Without suggesting in any way that the consequences of his criminal behavior—which "have been severe"—were not "deserved," it is Benjamin's fervent hope to finally stop "fighting uphill" and put the case behind him.  *Id*.  To that end, Benjamin decided to resolve the criminal and civil matters pending against him by coming to the United States voluntarily to face the criminal charges, pleading guilty to those charges, and settling with the SEC.

#### 1. Factual Admissions

Benjamin accepts full responsibility for his actions.  As the plea agreement makes clear, Benjamin admits that, "in violation of a duty of trust and confidence, and for his personal benefit, [he] stole material non-public information from his employer and provided that information to co-conspirators so they could execute timely, profitable securities transactions based on the information he supplied."  In addition, Benjamin does not contest the factual allegations against him in the superseding indictment.  Specifically, Benjamin concedes:

- the allegations in paragraphs 1 through 12 regarding his and Darina's employment, their access to material non-public information (MNPI) at their respective places of employment, the names of the companies whose

MNPI was accessed, the passing of that MNPI to the Dodelandes, and the trading on that MNPI by others;

- the allegations in paragraphs 14 through 17 regarding the means and methods of the conspiracy; and

- the allegations in paragraphs 19 and 20 regarding Benjamin's receipt of information from another insider after Darina was terminated, and the benefits that Benjamin and Darina received.

As noted, Benjamin takes full responsibility for his criminal behavior.  He does not anticipate any material factual disputes at sentencing.

## 2.  Advisory Guidelines Calculation

The plea agreement includes a stipulated Guidelines calculation, as follows:

- an offense level of 19, stemming from:

  o   a base offense level of 8;

  o   plus 14 levels for a loss amount greater than $550,000 but less than $1.5 million;

  o   plus 2 levels for abuse of a position of trust;

  o   minus 2 levels for being a zero criminal history point offender;

  o   minus 3 levels for acceptance of responsibility;

- a criminal history category of I; and

21

- a resulting sentencing range of 30 to 37 months' imprisonment, the "Stipulated Guidelines Range."

In addition, the applicable fine range is $10,000 to $100,000. Benjamin has agreed to the entry of a forfeiture judgment in the amount of $510,000, payable within one year of sentencing, which will largely be satisfied by his payments to the SEC.

The plea agreement further provides that "either party may seek a sentence outside the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence" under 18 U.S.C. § 3553(a). Importantly, the Government has agreed that, if Benjamin accepts responsibility, commits no new crime after signing the plea agreement, and complies with the terms of the agreement, then "the Government will not advocate for a term of imprisonment greater than 366 days (including time already served) and will not advocate for the imposition of any fine."

### E. The SEC Settlement Agreement

On October 22, 2019, the Securities and Exchange Commission filed a civil action against Benjamin and Darina, *SEC v. Taylor*, 19 Civ. 9744 (JLR). The allegations in the SEC complaint largely mirrored the allegations in the criminal indictment. In late 2025, Benjamin agreed to a settlement in principle with the SEC. After the SEC completed its internal approval process, the parties submitted a consent and proposed final judgment for consideration by Judge Rochon. On February 17, 2026, Judge Rochon entered Final Judgment in that proceeding, 19 Civ. 9744, ECF No. 122, reflecting the settlement

between the SEC and Benjamin.  As part of that final judgment, Benjamin is permanently enjoined from engaging in securities violations.  In addition, Benjamin agreed to disgorgement of $500,000, representing net profits gained as a result of the conduct alleged in the complaint.  To date, Benjamin has paid $250,000; the rest of the disgorgement amount is due to be paid in December.

### V.    CONSIDERATION OF THE RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a) DEMONSTRATES THAT A SENTENCE OF TIME SERVED IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING

18 U.S.C. § 3553(a) directs that a court "shall impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection," which include "the need for the sentence imposed—":

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense,

(B) to afford adequate deterrence to criminal conduct,

(C) to protect the public from further crimes of the defendant, and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2) (emphasis added).

In addition to considering each of these purposes, the court also "shall consider" "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)), "the kinds of sentences available" (18 U.S.C. §

3553(a)(3)), "the kinds of sentence and the sentencing range established" under the applicable Sentencing Guidelines (18 U.S.C. § 3553(a)(4)), and "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct" (18 U.S.C. § 3553(a)(6)).

The range calculated under the Guidelines is purely advisory and serves as just one of the many factors that the Court is required to "consider" when fashioning an appropriate sentence. *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). "[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007). Indeed, "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guideline sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the [18 U.S.C.] § 3553(a) sentencing factors." *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010).

Benjamin respectfully submits that, after a thorough consideration of the relevant factors, an appropriate custodial sentence in this case would be time served (approximately two months' imprisonment in Monaco). As set forth below, such a sentence is consistent with sentences imposed on similarly situated defendants, takes account of Benjamin's decision to voluntarily travel to the United States to accept responsibility and the other circumstances discussed, and is "sufficient, but not greater than necessary" to achieve the goals of criminal punishment under 18 U.S.C. § 3553(a).

24

### A. A Sentence of Time Served Would Adequately Reflect the Out-of-Character Nature of the Offense in Light of Benjamin's History and Characteristics

Benjamin is fundamentally a kind, hardworking and humble person who strayed from his core values to engage in insider trading and who has worked tirelessly since his arrest in Monaco to redeem himself.  He fully intends to stay on the right path, consistent with those core values.

Benjamin's family members describe him as a person of honesty and integrity who is devoted to helping others.  Benjamin's father emphasizes the "extraordinary hard work" and "relentless dedication" that led to Benjamin's success in engineering and finance, earning graduate degrees at top schools in both fields.  At the same time, Benjamin is person of "great sensitivity, driven by a desire to help others."  C. Taylor Letter, Exhibits at 7.  Benjamin's mother likewise sees Benjamin as "a devoted son, a protective brother, and a person who has spent his life serving those he loves."  F. Taylor Letter, Exhibits at 10.  Benjamin's sister agrees that Benjamin's "true character" is "a man of immense heart, tireless work ethic, and profound devotion to his family."  O. Taylor Letter, Exhibits at 12.  Like Benjamin himself, Benjamin's mother points to the example set by her father—Benjamin's maternal grandfather—"who passed on values of courage, fair play, and hard work to reach a certain level of excellence."  F. Taylor Letter, Exhibits at 9.

Benjamin has shown similar devotion to his friends, as evidenced by the letter from his friend Jeremy Urano.  Urano witnessed that devotion first-hand when he and

Benjamin encountered severe weather when descending from Mont Blanc, and Benjamin "calm[ly]" and "methodical[ly]" "focused on the safety of the team above his own discomfort" to complete the descent, overcoming "physical exhaustion [and] genuine danger." Urano Letter, Exhibits at 17. Urano so trusts Benjamin that he has named him the godfather of his child. *Id.*

Against this backdrop, Benjamin's participation in this offense was entirely out of character and contrary to everything he had been taught to believe. Unfortunately, as a young and impressionable man Benjamin was drawn in by the access and influence that inside information seemed to buy, a world of fancy clothes, glitzy parties and expensive travel. He succumbed to social pressures in a way that he knew was wrong but that he failed to resist. As Benjamin himself assures the Court, he "understand[s] the gravity of what he did" and how wrong he was to "betray[] everything [he] had built." B. Taylor Letter, Exhibits at 4.

Benjamin has learned from his mistake. In his words:

> I am asking for a second chance—not because I am owed one, but because I believe that ten years of genuine rehabilitation, cooperation with authorities, and the honest business I have built from nothing are evidence that the person who made that catastrophic error is not who I fundamentally am.

B. Taylor Letter, Exhibits at 5.

Benjamin's family, friends and colleagues echo how Benjamin's "catastrophic error" is not who Benjamin "fundamentally [is]." Benjamin's mother avers that, since

26

returning to his parents' home after his arrest in Monaco, Benjamin "has applied himself to rebuilding mentally and his rediscovered his taste for nature and simple things."  F. Taylor Letter, Exhibits at 9-10.  Benjamin's father hopes the Court "will see in Benjamin a man who has learned from his errors and who is dedicated to getting his life back on track through honest, hard work." C. Taylor Letter, Exhibits at 7.

Those who have known Benjamin only since his arrest in Monaco similarly attest to the strength of Benjamin's character.  Benjamin's brother-in-law-to-be, Brendan Cody-Kenny, sees him as "a person of substance and genuine care for others."  Cody-Kenny Letter, Exhibits at 15.  Guillaume Cyprien, who has supported Benjamin's professional rehabilitation efforts in southern France, has witnessed Benjamin "work[] with extraordinary dedication—long hours, very few days off, and a [high] level of focus and discipline", "build[ing] something real from the ground up, with no shortcuts and no excuses." Cyprien Letter, Exhibits at 19.  Anne Marie Panunzi was highly impressed with the extraordinary effort, dedication, integrity and humility that Benjamin brought to his work for presidential advisors regarding the energy crisis in 2022.  That effort convinced Panunzi that "the charges against [Benjamin] do not define the man, and that he possesses the will and the character necessary to correct his trajectory with dignity." Panunzi Letter, Exhibits at 21.  Pierre Regent has made the same observations of Benjamin.  Indeed, Regent is so convinced of Benjamin's honesty and fundamental

27

decency that he recommends Benjamin "without reservation" to his esteemed network. Regent Letter, Exhibits at 23.

Given the "compelling evidence" before the Court of Benjamin's "capacity for rehabilitation," Panunzi Letter, Exhibits at 21, we urge the Court to recognize his criminal conduct for what it is:  an aberration in an otherwise honest, hardworking, and law-abiding life.

**B.  Benjamin Has Accepted Responsibility and Is Deeply Remorseful**

Benjamin could have stayed in France, beyond the reach of the Court's criminal jurisdiction, but he chose instead to come to the United States voluntarily, accept responsibility for the criminal charges against him, and face sentencing.  No other person involved in the scheme has taken these highly unusual steps.  While he hopes that the Court will exercise its discretion to impose a sentence of time served, he recognizes the risk that he will be further incarcerated.  Taking that risk was worth it, in Benjamin's view, because he so sincerely wants to make amends and move forward with his life—without forgetting the lessons he has learned from his mistakes.  Benjamin recognized that, without accepting criminal responsibility and facing the consequences of his actions, he could never fully make amends and progress his rehabilitation.

Importantly, Benjamin has been trying to make amends since his incarceration in Monaco in several ways.  First, he has repeatedly offered his full cooperation with the authorities in both the United States and France.  Through counsel, he has repeatedly

provided information to the USAO, but those attempts at cooperation did not bear fruit.

Notably, the two men to whom Benjamin provided inside information—the brothers

John and Kevin Dodelande—both received non-prosecution agreements from the USAO

in exchange for their cooperation before Benjamin was arrested.[3]  Darina Windsor, who

procured most of the inside information that Benjamin provided to the Dodelandes,

recently entered into a deferred prosecution agreement with the government.  ECF No.

67.

Benjamin also offered to cooperate with French authorities.  Beginning in 2020,

Benjamin provided extensive information through counsel to the PNF regarding the

insider trading scheme and the individuals involved.  This information included email

communications between Benjamin and the Dodelandes, travel records, and

chronologies reflecting relevant events that occurred in France.  However, to our

knowledge the PNF did not use the information Benjamin provided to pursue any

prosecutions.  That result, while unfortunate, is no reflection on the sincerity or

comprehensiveness of Benjamin's efforts.

---

[3] As the Court learned at the trial of Telemaque Lavidas, 19 Cr. 716 (DLC), ECF No. 98, John Dodelande was an art dealer.  Lavidas Tr. 354-56.  John Dodelande and later his brother Kevin Dodelande served as middlemen passing confidential inside information to traders like Marc Demane Debih and Joseph El-Khouri, who in turn passed the information onto other traders.  Lavidas Tr. 359-60.  Demane Debih paid John Dodelande $12 million in cash for the information.  Lavidas Tr. 362-63.

The bottom line is that Benjamin deeply regrets the crimes he committed. As he put it so profoundly and succinctly in his letter to Your Honor, his criminal behavior "betrayed everything" he stood for. If he could take it back, of course he would. But Benjamin cannot turn back the clock; he must move forward. And to move forward he is determined to stand before Your Honor and accept the consequences of his actions.

## C. A Sentence of Time Served Is Consistent with Sentences Imposed on Defendants Convicted of Similar Conduct

18 U.S.C. § 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Here, a sentence of time served would be consistent with sentences imposed in the Southern District of New York on defendants with no prior criminal history who have been convicted of insider trading based solely on their role as a tipper. Indeed, in the Southern District of New York, defendants in that position have consistently received sentences substantially below the Guidelines range, even after proceeding to trial (unlike Benjamin) and even in the face of aggravating factors such as obstruction of justice. And here, of course, the Government has agreed that a sentence well below the Guidelines range of 30 to 37 months is warranted under all of the circumstances presented.

Two such cases in which a sentence well below the Guidelines range was imposed involve defendants who were involved in the same overlapping network as Benjamin and who, like Benjamin, provided inside information that was ultimately passed onto

30

trader Marc Demane Debih:  Bryan Cohen, who was sentenced by Judge Pauley, and Telemaque Lavidas, who was sentenced by Your Honor.

Bryan Cohen's facts and circumstances were remarkably similar to Benjamin's. Like Benjamin, Cohen was a junior employee at an investment bank—in Cohen's case, it was Goldman Sachs—and passed inside information about several deals onto traders over an approximate two-year period in exchange for cash.  Like Benjamin, Cohen, a French citizen who was working in New York at the time of his arrest, was facing a Guidelines range of 30 to 37 months.  Recognizing that Cohen's offense, while serious, was an aberration in an otherwise law-abiding and hardworking life, Judge Pauley sentenced Cohen to time served (Cohen had been under home confinement for seven months) plus 12 months of supervised release with a condition of home confinement. *United States v. Cohen*, 19 Cr. 714, ECF No. 48 (S.D.N.Y. June 9, 2020).  Of course, unlike Benjamin, Cohen did not voluntarily travel from France to New York to accept responsibility, since he was already living in New York when he was arrested.

On several occasions, Telemaque Lavidas passed inside information about his father's pharmaceutical company onto George Nikas, resulting in a total gain to Nikas of over $7 million; Demane Debih also traded on the information and profited approximately $650,000.  Following his conviction at trial, Lavidas's Guidelines range was 63-78 months, yet the Court sentenced Lavidas to only one year and one day of imprisonment.  Notably, Lavidas did not accept responsibility for his offense even after

his conviction at trial on what the Court described as "overwhelming" evidence.  Even

accepting that the sentence was imposed in mid-2020 during the COVID pandemic, the

sentence was considerably below the advisory Guidelines range in a case that resulted in

substantial gains for the tippee traders.  *United States v. Lavidas*, 19 Cr. 714, ECF No. 127

(S.D.N.Y. July 2, 2020).

Other unrelated insider trading cases also demonstrate that defendants convicted

of similar conduct often receive sentences well below the advisory Guidelines range:

First, in *United States v. Chow*, 17 Cr. 667 (S.D.N.Y. Jan. 17, 2019) (GHW), on at

least eight occasions, Chow leaked inside information to a friend about deals in which

his private equity investment firm was involved, resulting in over $5 million in trading

profits for the friend.  Although Chow did not receive a financial benefit in return, he did

benefit from potential future business opportunities.  When he was asked about the

trades by investigators at FINRA, Chow lied about them.  Chow was convicted after trial.

*Chow*, 17 Cr. 667, Government Sent. Submission, ECF No. 148 at 1-8.

Despite a Guidelines range of 63 to 78 months' imprisonment, Judge Woods

imposed a sentence of only three months' imprisonment, to be followed by two years of

supervised release.  In support of that sentence, Judge Woods emphasized that Chow

was only a tipper who provided the information to a friend who was the true ringleader

and financial beneficiary of those tips.  Indeed, like Benjamin, Chow had no control over

32

how his tips were used, nor did he receive the bulk of the illicit profits.  *Chow*, 17 Cr. 667, Sent. Tr., ECF No. 161 at 73-75.

Admittedly, here Benjamin did receive some financial benefits from the tips he passed onto the Dodelandes, but the benefits he received pale in comparison to the profits earned by the Dodelandes and the traders.  Demane Debih alone made $70 million, and the Dodelandes in turn pocketed at least $12 million.  *See supra* fn.2. Moreover, like Chow, Benjamin was motivated by a desire to please the Dodelandes and to be accepted by their network of associates.  And unlike Chow, Benjamin has not lied to the authorities.

Second, in *United States v. Nguyen*, 12 Cr. 495 (S.D.N.Y Mar. 14, 2013) (NRB), Nguyen, the President of an investment research firm, stole confidential information from his sister about the public company where she worked and passed that information onto his firm's clients in exchange for fees.  For over three years, Nguyen fed this information to employees at three different hedge funds, who in turn used the information to generate profits of over $6.2 million.  The hedge funds paid Nguyen as much as $15,000 per month for the information.  In addition, Nguyen traded on the confidential information himself, generating $147,000 more in illicit gains.  Following his guilty plea, Nguyen faced a Guidelines range of 46-57 months.  *Nguyen*, 12 Cr. 495, Government Sent. Submission, ECF No. 13 at 2-4.  Noting that Nguyen did not control the amount of profit generated by the tippees, Judge Buchwald sentenced Nguyen to

one year and one day of imprisonment for conduct arguably far more serious than

Benjamin's.  *Nguyen*, 12 Cr. 495, Sent. Tr., ECF No. 34-1 at 19-20.

Third, in *United States v. Collins*, 18 Cr. 567 (Jan. 23, 2020) (VLB), Cameron Collins

obtained inside information about a pharmaceutical company from his father,

Christopher Collins, who served on the board of the company and was at the time a U.S.

congressman.  Cameron passed the MNPI onto a family friend and also traded on the

information himself.  Together he and the friend used the inside information to avoid

losses of over $750,000.  After initially lying to the FBI about his misconduct, Cameron

accepted responsibility and pleaded guilty.  Citing a lifetime of good conduct and the

fact that he was a first-time offender, Cameron argued for a sentence of probation

despite a sentencing range of 37-46 months.  *Collins*, 18 Cr. 567, Government Sent.

Submission, ECF No. 152 at 1, 18-21, 28-32.  Judge Broderick agreed that imprisonment

was not warranted and imposed a sentence of five years' probation.  *Collins*, 18 Cr. 567,

Judgment Crim. Case, ECF No. 173.

Cameron Collins's probationary sentence—despite avoiding substantial losses by

trading on inside information—is not unique in the Southern District.  Southern District

judges have regularly imposed minimal or non-custodial sentences on defendants who

profited by trading on inside information.  For example, Judge Marrero imposed a

sentence of probation on Bill Tsai, an investment banker who "orchestrated three

different insider trading schemes" in which he earned substantial profits, tipped a

34

relative who also traded (together earning a profit of approximately $126,000), and "lied to his employer about the existence of the brokerage account in which he made the illegal trades." *United States v. Tsai*, 19 Cr. 675 (S.D.N.Y. Jan. 10, 2020) (VM) (ECF No. 23), Government's Sent. Submission at 6, 10; *see also* Sent. Tr., ECF No. 32.

Judge Kaplan similarly imposed a sentence of only three months' incarceration on Woojae Jung, an investment banker at Goldman Sachs who earned substantial profits by trading on, and tipping his brother about, inside information obtained from his clients concerning nearly a dozen different corporate transactions. *United States v. Jung*, 18 Cr. 518 (S.D.N.Y. June 3, 2019) (LAK) (ECF No. 51), Government's Sent. Submission at 1-3; *see also* Sent. Tr., ECF No. 60. Together Jung and his brother earned profits totaling $130,000 and Jung tried to conceal his illicit activity by having his brother execute the trades. Government's Sent. Submission, ECF No. 51 at 1-3.

Judge Woods imposed a sentence of three months' imprisonment on Paul Feldman, who traded aggressively on MNPI he received from another tippee and also passed the MNPI onto others. Feldman personally earned approximately $1.73 million in profits from his insider trading activity. Like Benjamin, Feldman faced a Guidelines range of 30-37 months. *United States v. Feldman*, 23 Cr. 320 (S.D.N.Y. May 15, 2024) (GHW) (ECF No. 113), Government's Sent. Submission at 1-5. Judge Woods sentenced Feldman to three months' imprisonment despite the magnitude of Feldman's gain, the

35

breadth of Feldman's tipping, and Feldman's continued pursuit of inside information after the initial trades.  Sent. Tr., ECF No. 127 at 37-52.

As this review of sentences imposed in other insider trading cases demonstrates, a sentence of time served—nearly two months' imprisonment—would fit within the range of sentences others engaged in insider trading have received and avoid an unwarranted disparity with those other sentences.  Indeed, unlike Benjamin, some of the offenders in these other cases proceeded to trial, thus failing to accept responsibility, and even obstructed justice by lying to the authorities about their misdeeds.  And the reasons for the below Guidelines sentences imposed on others—extraordinary acceptance of responsibility, substantial and sincere efforts at rehabilitation, and severe collateral consequences in the event of incarceration—apply even more so here.

Unique among defendants in both related and unrelated cases, Benjamin has come to the United States voluntarily to accept responsibility and face punishment. Notably, several other persons involved in this insider trading scheme have not faced prison time at all.  As noted above, the Dodelande brothers entered into non-prosecution agreements with the government; as a result, they have not been prosecuted and will never serve a day in prison, despite receiving $12 million cash from Demane Debih in exchange for the confidential information they provided.  While they have apparently cooperated with the USAO pursuant to their non-prosecution agreements, they were not required to plead guilty and be sentenced.  And Darina

36

Windsor, the source of most of the tips that Benjamin passed onto the Dodelandes,

recently entered into a deferred prosecution agreement with the USAO, appearing by

video-conference from her home in Thailand.  18 Cr. 814, ECF Nos. 67-68.

In sum, a sentence of time-served appropriately considers "the need to avoid

unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct."  *See* 18 U.S.C. § 3553(a)(6).

### D. The Danger of Sentencing Disparity Is Greatly Enhanced by Virtue of Benjamin's Non-Citizen Status

The need to avoid unwarranted sentencing disparities among defendants with

"similar records" who have been found guilty of "similar conduct" is particularly acute

here because of Benjamin's non-citizen status.  If he is sentenced to a period of

incarceration, Benjamin will suffer more severe punishment than a U.S. citizen because

(i) he would not be able to serve his time in a minimum-security camp, and (ii) he would

not be eligible for any early release program or halfway house.  There is also a risk that

Benjamin would spend an indeterminate period following any imprisonment in an

immigration facility awaiting removal from the United States to France.

First, if he were a U.S. citizen facing a period of incarceration, Benjamin—as a

non-violent first-time offender—would be assigned to a prison camp, the least

restrictive "minimum security" facility within the Bureau of Prisons.  Given his non-citizen

status, however, Benjamin would be classified as a "deportable alien" and would be

37

designated at least to a "low security" facility, where the environment is considerably harsher and more difficult than at a camp.

Second, as a non-citizen, Benjamin would not be eligible for early release or partial home confinement programs, such as a halfway house.   Nor would Benjamin be eligible for earning early release credit by participating in certain programs or for furloughs.  As a result, Benjamin's sentence would in effect be longer than that of a U.S. citizen.

Finally, it is not clear that Benjamin would be permitted to leave voluntarily and return to France immediately upon his release from incarceration.  If he were transferred to ICE custody before removal, the extra time in custody—under undoubtedly harsh conditions of confinement—would further result in disparate treatment for Benjamin vis-à-vis a U.S. citizen.  A sentence of time served—with Benjamin required to return to France immediately after sentencing—would avoid any such disparity.

### E.  A Sentence of Time Served Will Achieve the Goals of Specific and General Deterrence

Under 18 U.S.C. § 3553(a)(2), the Court is required to consider the need to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant."  Courts have interpreted this to mean both specific and general deterrence.  *See United States v. Gupta*, 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012).

There is no need for specific deterrence in this case.  Benjamin is a first-time offender who is highly unlikely to be a repeat offender.  He left the investment banking

world behind long ago.  He spent two months in prison in Monaco, an experience that left an indelible impression on him:  after his unexpected arrest, he suddenly found himself imprisoned with persons accused and convicted of dangerous crimes, including violent offenses.  While he appreciated the support of his parents, who visited him every day, it was very difficult for him and for them to see him in jail.  Going to prison is an experience Benjamin will never risk repeating.  Additionally, Benjamin has been publicly shamed among his family, friends and business associates in France.  He has spent the past eight years since his arrest in Monaco rebuilding his career and his reputation, both of which were destroyed by his misguided behavior.  In short, Benjamin has learned his lesson and is squarely on the right path.

Statistics also show that Benjamin is unlikely to be a repeat offender.  True "first offenders" like Benjamin, with no prior convictions or arrests, have an "extremely low recidivism rate."  United States Sentencing Commission, *Recidivism and the "First Offender"* (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf, at page 17 (reporting a 6.8% recidivism rate for true first time offenders).  And defendants convicted of fraud-related crimes are less likely to recidivate than defendants convicted of any other crimes.  United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016), *available at*

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf, at page 20.

As for general deterrence, we respectfully submit that the goals of general deterrence have already been achieved and that further incarceration will not advance those goals.  Benjamin's involvement in the insider trading scheme has been well publicized; articles about the investigation and prosecution of other tippers and about those who traded on the inside information consistently identify Benjamin as one of the sources of the inside information.  Indeed, the press is following Benjamin's case closely and has already reported on his plea agreement;[4] the plea and sentencing proceeding before the Court is likely to attract media and lead to additional news articles, further highlighting Benjamin's criminal conduct.

In addition, Benjamin has already served two months in prison in Monaco, and it is the certainty of punishment, rather than its severity, that is the most effective deterrent for financial crimes.  *See United States v. Velazquez*, No. 16-cr-233, 2017 WL 2782037, *4 (S.D.N.Y. May 26, 2017) ("Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels . . . reached that conclusion, as has every major

---

[4] *See, e.g.*, https://www.bloomberg.com/news/articles/2026-02-28/ex-moelis-banker-to-plead-guilty-in-global-insider-trading-case.

survey of the evidence."') (citation omitted).  This is especially true with white-collar offenders.  *See* Richard A. Frase, *A More Perfect System: Twenty-Five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (2005).  Thus, there is no empirical reason to believe that additional incarceration beyond the time Benjamin has already served will provide more effective general deterrence.

**F.  A Period of Incarceration Will Upend the Progress Toward Rehabilitation that Benjamin Has Already Made and Impose Substantial Burdens on Benjamin's Parents and Sister**

The past eight years since his arrest and imprisonment in Monaco have been a monumental struggle for Benjamin as he has pulled himself up from the depths of the lowest point in this life—the point of greatest "distance between the person [he] was raised to be and the person [he] had become," B. Taylor Letter, Exhibits at 4—and worked to reestablish his professional and personal footing.

Professionally, Benjamin "started from zero.  [He] learned commodity trading from the ground up, transaction by transaction, with nothing but the same work ethic [his] grandfather modelled and the monks reinforced."  B. Taylor Letter, Exhibits at 4. While the work has been extraordinarily difficult, Benjamin has finally succeeded in building an "honest business" in energy trading, one that stands to be self-sufficient and income-producing.  However, as Guillaume Cyprien explains, "This year is a pivotal one. His business is genuinely gaining momentum after years of painstaking effort, and the trajectory is clear to anyone who has been close to the process."  Cyprien Letter, Exhibits

at 19.  Pierre Regent agrees that "[s]everal meaningful business projects are on the verge of materializing—projects that reflect years of disciplined effort and the kind of serious commercial relationships that are only built through sustained credibility." Regent Letter, Exhibits at 23.  As a result, both Cyprien and Regent are highly concerned that "[a] custodial sentence at this moment would not merely interrupt that progress; it would dismantle it entirely, and with it, everything [Benjamin] has sacrificed to rebuild." Cyprien Letter, Exhibits at 19.[5]

On a personal level, Benjamin's sister Olivia identifies Benjamin as ""the backbone of our family's caregiving efforts."  O. Taylor Letter, Exhibits at 12.  His continued presence is therefore a "crucial necessity for our family's stability and health."  *Id*. at 13. Not only does Benjamin provide crucial support to his aging parents as his father undergoes ███████████, but Benjamin is also critical to the stability of Olivia's family after Olivia undergoes ████████ and is unable to care for her infant daughter. Without Benjamin's help, Olivia's fiancé, Brendan Cody-Kenny, will have to take care of the child alone, meaning that his start-up business may not be able to survive.  For Olivia, "having [her] brother by [her] side will be essential for [Olivia's] recovery" *id*., and the continued financial stability of her family.

---

[5] It is also critical that Benjamin continue working so that he can repay family members who are helping him pay the $500,000 SEC settlement.

In short, not only would a period of incarceration not serve as either a specific or general deterrent, but it would also have severe collateral consequences for Benjamin and his family.  Under the circumstances, a sentence of time served is appropriate.

## VI.    CONCLUSION

Benjamin Taylor has spent the last eight years—since "the lowest point" in his life, his incarceration in Monaco—working to rebuild his reputation, to regain the trust and respect of his family, friends and colleagues, to rehabilitate himself, and to put himself in a position where he can support his family financially, physically and emotionally. Benjamin made a terrible mistake, one for which he has already paid dearly, and one which he hopes to put behind him while not forgetting the lessons he has learned from that mistake.  Now once again on firm footing, living according to the values with which he was raised, Benjamin has traveled here from France to seek a  second chance from the Court that allows him to continue on an honorable path.  As Benjamin himself makes clear, this is not a second chance that he believes he is "owed", but a second chance he hopes the Court gives in light of his "genuine rehabilitation, cooperation with the authorities, and the honest business [he has] built from nothing," all of which are "evidence that the person who made the catastrophic error is not who [he] fundamentally [is]." B. Taylor Letter, Exhibits at 5.

43

For these reasons, we respectfully submit that a sentence of time served is sufficient, but not greater than necessary, to achieve a just punishment under 18 U.S.C. § 3553(a).

Dated: May 15, 2026

Respectfully submitted,

By: s/ Celeste Koeleveld
Celeste L.M. Koeleveld
Daniel S. Silver
Argjenta Kaba
CLIFFORD CHANCE US LLP
Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone: (212) 878-8000
celeste.koeleveld@cliffordchance.com
daniel.silver@cliffordchance.com
argjenta.kaba@cliffordchance.com

*Attorneys for Defendant*
*Benjamin Taylor*